ALBANY,
Jan. 1815.

SALTUS
v.
OCEAN INS. Co.

---

SALTUS AND OTHERS *against* THE OCEAN INSURANCE COMPANY.

THIS was an action on a policy of insurance, dated the fifth of *December*, 1810, upon the *freight* of the ship *Hudson*, at and from *Riga* to *New-York*. The policy was valued and underwritten for 7,000 dollars. The cause was tried at the last *April* sittings in *New-York*. The abandonment was duly made

It is the duty of a master, when the ship becomes disabled, during the voyage, to procure another vessel, if in his power, to carry on the cargo, to its

destined port; but he is not bound to seek another vessel out of the port of distress, or out of a port immediately contiguous thereto; and if part only of the cargo is sent to its port of destination, in another vessel, the insurer on freight is not entitled to a deduction or allowance for the freight earned on that part; unless he shows that the goods were delivered to the insured at the port of destination; or that they had notice of their arrival and situation.

It *seems*, that if the cargo is of such a nature, that it is impracticable to reship and transport it to its place of destination, without an expense equal to its value, or nearly so, or without manifest detriment to the owners, it may be sold at the port of distress, and need not be sent on in another vessel.

Insurance on *freight* from *Riga* to *New-York*. The bulk of the cargo consisted of *hemp*, and the residue of manufactured goods and iron. The vessel sprung a leak, and put into *Kinsale* in distress, where, on a survey, she was found incapable of prosecuting her voyage, unless repaired at an expense equal to her value: and the master, with the advice of the merchants and others at *Kinsale*, sold the *hemp* at *Kinsale*, and shipped the residue of the cargo in another vessel to *New York*, which, however, was not capable of taking more than one-third of the *hemp*, as there was no machinery to pack and stow it in the *Russian* mode, it was held, that the insured were entitled to recover for a total loss of the freight, it not appearing that the goods reshipped for *New-York* had reached there, or that any freight had been earned.

on the 21st *August*, 1811, and the usual preliminary proof of interest and loss given.

The cargo of the *Hudson*, for the voyage insured, consisted of 15 tons of manufactured goods, 80 tons of iron, and 171 bundles, containing about 126 tons of hemp, shipped on account of the plaintiffs, who were also owners of the vessel.

The master testified that the *Hudson* sailed from *Riga*, in *Russia*, on the ninth of *October*, 1810, bound to *New-York*. In the *North Sea* she experienced boisterous weather, and began to leak; and when off the coast of *Ireland*, her leak had so much increased, that it was thought necessary to put into *Kinsale*, to repair, and she arrived at that place on the twelfth of *November*. She was there surveyed and repaired, without unlading her cargo. On the twenty-eighth of *December*, she set sail again for *New-York*, and after being at sea about three days, and having proceeded about 500 miles on her course, she encountered a very heavy gale of wind, and received a very heavy stroke of the sea, which, as the master supposed, started a plank near her keel, as she immediately began to leak very fast, so that she could not be kept free with both pumps; and the gale and force of the sea was so great, as would, in the opinion of the master, have endangered any vessel in the same situation. It became necessary to seek a port to refit, and the commander of an *English* frigate, who spoke the *Hudson*, sent his carpenter on board to examine her, and advised the master to abandon her, as the leak was so bad. The master, however, bore away for *Kinsale*, which he again reached, on the twelfth of *January*, 1811, where he run the ship into the mud, to prevent her sinking. Another survey of the vessel was then made, and it was judged, that from her state, and the high price of labour and materials at *Kinsale*, she could not be repaired for less than her value, which was also the opinion of the master, as it would be necessary to take off the sheathing. The cargo was landed, and the vessel sold at auction, which was judged best for the interest of the concerned.

On the survey last mentioned, they took off, under the mizen chains, on the larboard side, a plank about 12 feet in length, and found three or four rotten timbers, from which it was concluded that there were other timbers rotten. But if the timbers had not been rotten, she could not have been repaired but at an enormous expense, owing to the high price of materials

ALBANY,
Jan. 1815.

s.
LTUS
v.
OCEAN INS. Co.

and labour. The master further stated, that had he known the state of the vessel, at *Riga*, he would not have sailed from that place, at that season, without having her thoroughly repaired, which might have been done at *Riga* for half the expense which the repairs would have cost at *Kinsale;* but he had no doubt, that, in ordinary weather, the vessel would have performed the voyage in safety, without repairs; and that any other vessel, however sound, could hardly have withstood the storms the *Hudson* experienced. From his subsequent knowledge of the vessel, he was led to believe, that when she left *Riga*, she was insufficient for the voyage, though she might have been competent for a summer voyage; and at the time of her departure, her sails and rigging were in good order, and were so when she was sold at *Kinsale.*

The master hired a *Baltimore* vessel, called the *Friendship*, for 200 pounds sterling, at *Kinsale*, to bring home the manufactured goods and iron, composing part of the *Hudson's* cargo. This vessel was not one fourth loaded, but the hemp could not have been taken out of the *Hudson*, in bales; and the rebinding and stowing it, in another ship, would have been equal to its value; and in the state in which it was, the *Friendship*, in addition to the other goods, could not have taken more than thirty tons of the hemp. There were only two other *American* vessels at *Kinsale*, neither of which was bound to the *United States*, and they had cargoes. There were twelve or more *American* vessels at *Cork*, which is 16 miles from *Kinsale*. The master made no attempt to procure any of them to bring home the *hemp*, which he supposed they would have done, on a freight. The hemp was landed and sold at auction at *Kinsale*, principally to *Cork* merchants, and the average price, as appeared by the account of sales, of *Harvey, Deaves & Harvey*, the merchants under whose direction it was sold, was sixty-one pounds sterling per ton. It appeared that the hemp is packed and stowed in *Russia* by the means of machinery and screws, and that there were no such machinery or screws at *Kinsale*, so that it could not be shipped in the usual manner; and if stowed loose, it would not pay a freight. The master acted by the advice and opinion of *Harvey, Deaves & Harvey*, the merchants, and he also consulted the two *American* captains there. He said the hemp could not have been sufficiently compressed by jack-screws, about which he made no inquiry. It would have required two

or three vessels, of the size of the *Hudson*, to have brought home the hemp, without its being packed and stowed in the *Russian* manner.

The *Hudson*, on her arrival at *Kinsale*, had performed about one third of her voyage. The goods on board the *Friendship*, on her arrival at *New-York*, were seized by the collector of the customs.

Several witnesses for the defendants, acquainted with the *Russia* and *Irish* trade, stated their opinion, that the hemp might have been packed with jack-screws; that in consequence of the non-intercourse law, it might have been reshipped to this country for a fourth or an eighth of the usual freight; and that four tenths of the voyage was performed, from *Riga* to *Kinsale*, as to the distance.

It appeared, from the testimony of the carpenter who repaired the ship, in 1810, just before she sailed for *Russia*, that her timbers were sound; and that, in his opinion, she was not only seaworthy, but a remarkably strong, well-built vessel; that the rotten timbers, in the place described by the master, could not render the vessel unseaworthy.

It was agreed that the amount of general average, if any was claimable, should be adjusted by persons to be appointed by the court.

The judge charged the jury, that if they found the vessel seaworthy; and if, in their opinion, the hemp could not be reshipped in a merchantable condition, or the expenses of reshipment and transportation to *New-York*, in another vessel, would have increased the freight to more than a moiety of the freight as valued in the policy, they ought to find a verdict for the plaintiffs for the amount insured, as for a total loss, deducting a *pro-rata* freight from *Riga* to *Kinsale*, being four tenths of the voyage insured, and that the defendants were not entitled to any allowance or deduction on account of the iron and manufactured goods which were transported to *New-York* in another vessel.

The jury found a verdict for the plaintiffs for a total loss, or 4,935 dollars and thirty cents, after deducting a *pro rata* freight of four tenths, equal to 3,291 dollars and 19 cents; and they also found a general average of 274 dollars and 67 cents, to be adjusted by the direction of the court.

A motion was made to set aside the verdict, and for a new trial.

*Griffin*, for the defendants, contended, 1. That the vessel was not seaworthy, when the policy attached.

2. That the assured ought to have sent home the *whole* cargo, by another vessel. *Abbot*, 195. *Schieffelin* v. *Columbian Insurance Company*, (9 *Johns. Rep.* 21.)

3. If the assured were unable to bring home the whole cargo, in another vessel or vessels, their inability to do so arose from the peculiar nature of the cargo, which circumstance ought not to affect the insurers. 3 *Johns. Cases*, 93. 3 *Johns. Rep.* 321. 1 *Johns. Cases*, 293.

4. That the defendants were entitled to an allowance or deduction for that part of the cargo which arrived at *New-York*, its port of destination. *Abbot*, 244. *Park*, 70, 71. 2 *Johns. Cases*, 233.

*Hoffman* and *T. A. Emmet*, contra, insisted, 1. That the plaintiffs were entitled to recover as for a total loss, without any deduction for *pro rata* freight; and, 2. That the jury having found a total loss, and, also, found the *pro rata* deduction, that the judgment ought to be for the whole amount, being 8,326 dollars 39 cents, together with the general average.

YATES, J. delivered the opinion of the court. There can be no reasonable doubt of the seaworthiness of the vessel when the policy attached. The captain does not declare, satisfactorily, what her situation really was when she left *Riga;* but is explicit as to her ability to perform the voyage had he experienced ordinary weather; and he says, that a perfectly sound vessel would hardly have withstood the storm he experienced, yet, if he had known her situation, he would not have gone in her. This opinion, however, appears to be formed altogether on the discovery of the decayed timbers in her at *Kinsale*. The carpenter states that the rottenness of those timbers, in the part of the vessel described by the master, could not make her unseaworthy, as little or no stress could come on the place where they were found. The weight of evidence appears decidedly in favour of her seaworthiness, and, of course, warranted the verdict of the jury, and they having passed upon it, their decision ought to be conclusive.

The policy being on *freight*, it is urged that the master ought to have sent home the whole cargo by another vessel or vessels.

That the master has a right to hire another vessel and carry on the cargo, so as to entitle him to his freight, has at all times been allowed; and the decision of this court, in *Schieffelin* v. *New-York Insurance Company*, (9 *Johns. Rep.* 21.) establishes the principle that it is his duty to find another vessel by which to carry the goods to the place of destination, if it is in his power to do so. It never was intended by this decision to make it incumbent on the master to procure a vessel elsewhere, out of the port of distress, or out of a port immediately contiguous; and such limitation is perfectly correct, because the extension of this rule, as contended for, would be attended with insurmountable difficulties and embarrassments to masters. In the present case he would have been obliged to travel sixteen miles, the distance between *Kinsale* and *Cork*, and what his conduct ought to be, if the distance had been greater, could not be ascertained. It would be requiring an act, as a duty, the extent of which the master could not at all times know or understand. A due regard, therefore, to the protection of masters of vessels, as well as the interest of the assured, renders some limitation indispensable; and that must necessarily be by confining the inquiry or search for another vessel, to the same port, and no other, unless it be a port contiguous and at hand. In this case, no vessel could be obtained at *Kinsale*; he was, therefore, under no obligation to procure one at *Cork*; and such being the true and correct definition of the master's duty, it was not necessary for the plaintiff to show that the attempt had been made to procure a vessel at *Cork*.

Admitting, however, that it would be the captain's duty, with an ordinary cargo, to procure a vessel at *Cork* to send it on, no such obligation could possibly exist in this case, as the situation of the cargo rendered a reshipment improper.

It appears evident that the master, throughout the whole business, acted in good faith. He consulted one of the most respectable mercantile houses at *Cork*, as well as two *American* captains, who were there at the same time, and who saw the situation of the cargo. They all concurred in advising the sale of the hemp, no doubt from a conviction that to carry it to the place of destination would be detrimental to the owners.

It appears that it would have required three or four vessels of the *Hudson's* size to take it, in consequence of its elasticity ; and that the *Friendship* could have carried but thirty tons of it. The captain could not, therefore, be chargeable with negligence for not separating the article and shipping so small a part of it loose, and at an extra expense, when obliged to dispose of the residue. It would have been a measure manifestly against the interest of the owners, for all the witnesses agree that a reshipment of the hemp, in a merchantable condition, would have increased the expenses enormously ; and some of them declare that to stow it in a vessel, as it had before been in the *Hudson*, would have made the expense equal to its value, for the want of proper machinery for the purpose, at *Kinsale;* and such must have been the opinion of the jury, under the directions given them, and expressed by their verdict, that those expenses would have amounted to a sum so extravagant, as to forbid a reshipment with such a cargo. It is, therefore, to say the least, extremely questionable whether the master, who acted in good faith, was not perfectly justifiable. Having, however, before shown that the inquiry ought to be confined to the same port, or one contiguous to it, it is not necessary to decide this cause on any other ground.

It is contended that the underwriters ought to be allowed the amount expended on account of a part of the cargo which reached its port of destination.

They are certainly not entitled, upon any principle, to a deduction beyond a proportionate allowance for freight actually earned ; and to authorize such deduction, it was incumbent on the defendants to show that those articles had been delivered to the plaintiffs, at the port of destination, or to bring home to them notice of their arrival and seizure, but no delivery or notice to them appeared on the trial. They, therefore, cannot claim a compensation in this instance.

Judgment for the plaintiffs.