*CENTER *against* THE AMERICAN INSURANCE COMPANY
OF NEW YORK.(a)

THE SAME *against* THE SAME.

THE first suit was assumpsit for a total loss on a valued policy of insurance upon the ship Pallas, owned by the plaintiff, valued at $10,000, the sum subscribed, on a voyage at and from New Orleans to Havre; and at and from thence, back to a port of discharge in the United States. The cause was tried at the New York Circuit, April 15th, 1826, before WALWORTH, C. Judge.

On the trial, the policy was produced and proved, bearing date November 24th, 1824. It appeared that on the 22d, the Pallas, being seaworthy, left New Orleans with a full cargo of cotton; and proceeded on her voyage down

*If a vessel or goods insured on a sea voyage, be damaged to more than half of the value, by any peril insured against, the assured may abandon, and recover for a total loss.*

*As to the vessel, the meaning of the words in the rule, "one half of the value,"* is the half of the general market value of the vessel at the time of the disaster, not her value for any particular voyage or purpose.

In estimating the expense of the repairs, such sum is to be taken as will place her in *statu quo*, in general with the same kind of materials of which she was composed at the time of the disaster.

Thus, if she be copper sheathed, and her sheathing injured or destroyed by the disaster, the expense of repairing and re-sheathing with the same material, must be taken into account; and this, though a sheathing of wood might render her seaworthy for the voyage.

The expense of thus repairing at the port of necessity, is the true test for determining the amount of the injury.

The term *repair* means to *amend* or *restore*, or *fully reinstate* the vessel.

Where a ship is injured by a peril insured against, to more than one half of her value; and a sale is recommended on proper surveys, *semble*, that the master may sell. But if he sell improperly, and without authority, this does not take away the right in the assured afterwards to abandon.

In general, the master cannot impair the right to abandon by any act he may do. Repairing and putting the vessel on her voyage is one exception.

The abandonment of a vessel does not effect the remedy on the policy upon the freight.

But, in general, where another vessel can be obtained to carry on the cargo from the port of abandonment, it is the duty of the master to tranship the cargo and earn freight; and if he neglect to do this, the insured on freight cannot recover.

Yet, where a vessel was driven back to the port of departure, and there abandoned as for a total loss, no progress, therefore, being made in the voyage, and no freight *pro rata itineris* earned, though the goods were accepted by the shippers; *held*, that the loss on freight was absolutely total; that there was nothing to abandon to the underwriters on the freight and that under such circumstances, the master was not bound to procure another vessel, and proceed with the goods to warrant a recovery upon the freight policy.

Where a vessel proceeds; but is totally lost at so early a stage of the voyage, that more than half the freight must be lost to the assured, and the shipper receives his goods, it is a technical total loss of the freight, and the assured may abandon.

The three objects of insurance, *vessel, cargo,* and *freight,* stand on the same ground, as to technical total loss by a deterioration to more than one half of the value.

(a) This first cause was decided at August term last, and the second at the present term.

ALBANY,
Oct. 1827.
———
Center
v.
American Ins.
Co. of N. Y.

the Mississippi. On the 23d, she struck upon the spit, a little north of the bar at the mouth of that river; and on the 24th grounded on the bar. In consequence of injuries received here, she was obliged to put back to New Orleans *to be repaired, where she arrived on the 5th of December. On the 6th, and several subsequent days in that month, she underwent the proper examination and surveys by the port wardens; who recommended a sale, in consequence of the large amount which was required to repair her. On the 17th of January, 1825, she was sold accordingly by the master, and Russell the consignee. This was also sanctioned by the examination of Andrew Seguin, master carpenter, and captains Jacob Forman, W. Fosdick and Edward Nicoll, who also made a survey, and reported in favor of a sale. The ship brought, at a well attended auction, $2,800. On the 21st of January, 4 days after the sale, the plaintiff abandoned the ship to the underwriters as for a total loss: and now claimed $8,431 21, the amount of that loss, after crediting the net proceeds of the sale; and charging interest from the day of the abandonment.

It farther appeared that the Pallas was originally sheathed with copper; and that in consequence of the disaster, it became necessary to re-sheath her in some way. The article of copper could not be procured for this purpose at New Orleans; but was procurable either at the city of New York or at Havre: not nearer than New York. That a sheathing of wood would render her sea worthy, and competent to the performance of the voyage with a full cargo; but on her reaching New Orleans, the cargo was landed; and the shippers declined re-shipping, unless she was first sheathed with copper. The purchaser finally sheathed her with wood; completing the repairs about the 1st of May, 1825. A sheathing with copper, if it had been procurable at New Orleans, would have been much more expensive there, than at New York or Havre.

The counsel for the parties agreed that, for the purpose of determining the comparative amount of repairs which would constitute the right to recover for a total loss, the

valuation in the policy, of $10,000, should be taken as the true value of the vessel.

They then proceeded to evidence upon the comparative amount of repairs; the question being the usual one; whether *the ship was deteriorated by the disaster to more than one half of her value.

For this purpose the estimate exhibited by the plaintiff as a part of his preliminary proof, was read on the part of the defendants, by consent. Depositions were read and oral testimony received on both sides.

The counsel for the defendants prayed the judge to instruct the jury,

"That, for the purpose of ascertaining whether a constructive total loss had occured, the sum at which the vessel was valued in the policy, was to be assumed, &c." (Agreed to as above mentioned.)

"That the plaintiff had no right to abandon on the ground that the ship was incapable of being repaired at New Orleans, because materials for re-coppering her could not be there procured; but if the jury should be satisfied, from the evidence, that the vessel could have been repaired at New Orleans, without re-coppering, so as to render her competent to perform the voyage insured with a full cargo, the abandonment could not be sustained; and the recovery of the plaintiff must be confined to a partial loss. And that, in estimating the expense of repairs, no repairs for defects existing prior to the peril which had occasioned the loss, or arising subsequent to the arrival of the vessel at New Orleans, were to be taken into calculation, unless such repairs were necessary to render the vessel seaworthy."

The counsel further prayed the judge to instruct the jury,

"That there was no evidence to justify the sale of the vessel, on the ground of necessity; and that no circumstances had been shown, to warrant the sale, even to the supposition that a technical total loss had occured. And that the sale having been made by the master, and Mr. Russell, the agent of the assured, prior to the abandonment,

ALBANY,
Oct. 1827.
_____
Center
v.
American Ins.
Co. of N. Y.

was to be considered as the act of the plaintiff; and rendered his abandonment invalid."

The judge declared his opinion,

\*" That the mere inability of the plaintiff to re-copper the vessel at New Orleans, if she were not in fact injured to half her value, and could be otherwise rendered seaworthy, was not, of itself, sufficient ground of abandonment. But that the plaintiff was clearly entitled to have his ship repaired, and, of course, re-coppered at the expense of the defendants. And if the jury should be of opinion, that the expense of re-coppering the vessel at Havre, or New York, in addition to such repairs in New Orleans as would have rendered the vessel competent to perform the voyage insured, would have exceeded a moiety of her value making the deduction of one third new for old, and charging the plaintiff with the old materials not used, the abandonment was valid; and the plaintiff entitled to their verdict for a total loss."

To this opinion the counsel for the defendants excepted. The judge charged,

"That the right of the plaintiff to recover for a total loss, depended solely on the question whether the vessel was deteriorated half her value; and that they were bound to consider her as so injured, if they believed, from the evidence, that the expense of re-coppering her at Havre or New York, in addition to such partial repairs at New Orleans as would have rendered her seaworthy, and making the usual deductions and charges, would have exceeded a moiety of the sum at which she was valued in the policy. That he had made a statement, which he would submit to them, according to his view of the evidence; and which was founded partly on A. Seguin's answer to the ninth direct interrogatory, who was a witness on the part of the defendants; which statement he believed to be correct; and which, if correct, clearly entitled the plaintiff to recover for a total loss. That such were his views of the evidence: and if they agreed with him in opinion, the plaintiff would be entitled to a verdict. But this was a ques-

tion of fact, which it was their province to decide. This statement was as follows:

*Seguin's statement of the expense of repairs at New Orleans, $5,200

Difference of expense between sheathing with one inch and one and a quarter inch plank, 1500

$6,700

Deduct old copper, 800

5,900

Commissions, 177

Coppering in New York, 2,500

$8,577

Deduct 1-3d, 2,859

$5,817

Verdict for the plaintiff, for $8,431 21, the sum claimed.

The second suit was upon the policy on freight, valued at $6000, for the same voyage. In this suit, the verdict was for the plaintiff, by agreement, subject to the opinion of the court. The principal facts were the same as above, in the suit on the vessel policy; the plaintiff abandoning both for vessel and freight at the same time. It was, moreover, agreed, that the following facts should be inserted in the case, as having been found by the jury: 1. That the vessel could not have been repaired at New Orleans, by re-coppering her: 2. That if the copper could have been procured there at its usual price, the expense of full repairs would have exceeded the moiety, making the usual deduction: 3. That the vessel might have been repaired there, sheathing her with wood, so as to render her seaworthy and competent to the voyage, at less than a moiety. 4. That the expense of re-coppering at Havre or New York, added to repairs and sheathing with wood at New Orleans, would have exceeded a moiety of the valuation at New Orleans.

It was also admitted, that under an adjustment of genera. average at New Orleans, the plaintiff was bound to pay $237 47; and that he was entitled to recover to that amount; the supreme court to reduce .he verdict to what they should think the plaintiff's rights to be.

[*569]          *Verdict for the plaintiff for $6,694 42.

Motion, by the defendants, for a new trial in the first cause; and by the plaintiff for judgment in the second.

It was agreed that the plaintiff's counsel should open the argument.

*G. Griffin*, for the plaintiff.   1. That the partial repairs at New Orleans, with full repairs elsewhere, exceeded a moiety of the valuation.

2. If the repairs, wherever made, would exceed a moiety, the assured had a right to abandon.

3. The right to abandon was not defeated by the sale.

4. The assured had a right to abandon on the mere ground that the vessel could not be re-coppered at New Orleans.

5. He had this right, if, from appearances, and the opinion of the best judges that could be selected, the vessel was irreparable, except at an expense exceeding her value when repaired.

6. The value of the vessel at New Orleans, not that in the policy, should be taken to determine whether the deterioration exceeded the moiety.

As to the 1st point, he said it was a question of fact.

As to the 2d point, the vessel must be put in *statu quo.* The question is, what will it cost to make her so? (4 Cowen, 245, per Savage, Ch. J.) Sheathing with wood will not do. She was sheathed with copper. Loss of voyage is not the question. If deteriorated more than 1-2, the assured may abandon, though the vessel may have reached her port of destination. (4 Bin. 386; 3 Serg. and Rawle, 25.)

As to the 3d point, the sale was 4 days previous to the abandonment. It was made without the plaintiff's knowledge. The captain had a right to sell. (11 John. 295; 3

Moore, 115; 8 Taunt. 755; 4 Serg. & Lowb. 272; Phil. on Ins. 401, 412.) But whether this be so or not, an abandonment relates back to the time of the disaster; and if this justified the abandonment, no subsequent acts of agents could defeat the right. (9 John. 26; id. 8.)

*As to the 5th point, he cited Phil. on Ins. 400; 11 John. 295; 8 Taunt. 755: and as to the 6th, Phil. on Ins. 401, 402; 11 John. 295; 4 Cowen, 246.

[*570]

As to the freight policy; in addition to the above points, he said, the technical loss of the vessel, constituted, *per se*, a total loss of freight, inasmuch as no vessel could be obtained to transport the cargo at less than 1-2 the freight valued in the policy.

The general rule is, that a total loss of the vessel, actual or technical, includes the total loss of freight. (Phil. on Ins. 424; 3 John. Cas. 99; 18 John. Rep. 210; 15 Mass. Rep. 346.)

Again: By the abandonment, the property in the vessel passed to the underwriters. (1 John. Cas. 377; 2 id. 443; 3 Cain. 16; Phil. on Ins. 478, 479.) This did not defeat the freight policy. (3 John. Rep. 55.) Then the plaintiff had no further control over it. If he had used the vessel, he would have been a trespasser.

If the plaintiff had repaired of wood, the shippers would have refused to re-ship. They had a right to a coppered vessel, for which they had contracted; and actually refused to re-ship without it.

There was no obligation to tranship the cargo at an expense of more than 1-2 the freight. The case which will be relied on, (*Bradhurst* v. *Col. Ins. Co.*, 9 John. 17,) does not require it in such a case as this. There the expense would have been trivial. The court did not mean that the assured should tranship at any expense. This can only be required where the expense will be less than 1-2 the freight. If not, he may abandon. The principle in *Robinson* v. *Mar. Ins. Co.*, (2 John. 326, 7,) applies to the three subjects of insurance. Kent, C. J., takes it for granted that a loss of 1-2 of the freight warrants an abandonment. (18 John. 210, 211, 212, per Platt, J. S. P.)

*J. Duer* and *D. B. Ogden,* contra, contended for a new trial in the suit on the vessel policy; and for a judgment in favor of the defendants in the freight cause; or that the verdict in the last cause should be reduced to such \*portion of the general average incurred at New Orleans as was properly chargeable on the freight.

They said, if the abandonment of the vessel fails, that of the freight fails by necessary consequence.

They made these points on the vessel policy:

1. The plaintiff had no right to abandon; for, first, the vessel was not deteriorated to more than 1-2 her value; and secondly, the repairs necessary for the voyage were less than a moiety, making the usual deduction.

2. The judge misdirected the jury both as to the law and evidence.

3. The verdict was against evidence.

1. They admitted that the assured may abandon, as for a total loss, where the vessel has been injured by the perils of the sea beyond a moiety of her value, or so as to require repairs to that extent. They traced the history and origin of this rule through Phil. on Ins. 401, and 1 Wheat. 228; contending that no such rule as to the vessel is established in the English courts; (2 Burr. 683; id. 1198; 2 Taunt. 363;) and that the rule is not to be favored or extended. It has generally been put on innavigability. (1 Emerigon, ch. 12, s. 38; 2 Condy's Marshall, 562, 563, 571; Code de Com. Liv. 2 Tit. 16, s. 3, art. 369, 389; 2 M. & S. 240, per Ld. Ellenborough, 4 Bin. 507, Binney *arguendo ;* 2 B. & A. 513; 14 East, 466.)

The right, as sanctioned by our own cases, frequently tempts to a fraudulent abandonment of the voyage, in the hope of greater gain by this than its honest pursuit.

The actual damage to the vessel, instead of the expense of repairs, is the test. (4 Bin. 398.) The vessel should be so damaged as to be considered a wreck. (6 Mass. Rep. 482, per Parsons, C. J.) We must look to the actual state and condition of the vessel; not what her repairs will cost. These may be accidental; and were so here, depending on the expense at the port of necessity. The market price of

a vessel may be very low, where the materials for repair are very high. We do not find any case which settles that the amount of deterioration must be decided by a comparison of the sound with the damaged part. But we think *this mode recommends itself for its exactness, and is supported by reason and analogy.

On this principle, it cannot be pretended that the deterioration was anything like a moiety. (The counsel examined the evidence upon this view.)

But suppose the rule to be as stated by the plaintiff's counsel. By what standard is the value of the vessel to be ascertained; and what is intended by repairs? Are they such as shall place the vessel in all respects in her former condition and value? or such as shall restore her to a capacity of performing with safety the voyage insured, or, in other words, render her seaworthy?

We need not discuss the rule which is to fix the value of the vessel. It was agreed upon at the valuation in the policy. That this was the correct valuation, we merely refer to 11 John. 293, Emmet *arguendo;* Phil. on Ins. 402; and 2 Caines' Cas. in Err. 153.

The repairs are merely those which will render the vessel seaworthy; not those which will restore her to the original value. By the contrary rule, a very trifling loss might sometimes authorize an abandonment; as from the want of funds, materials, or other causes. The loss of a mast, rudder or cable, might render a vessel for a time unseaworthy, and drive her to a port of necessity for repairs; and if the loss cannot be repaired by materials precisely similar and of equal value, the assured may abandon, though the vessel may be rendered equally seaworthy without this. The claim rests rather on the impossibility, than the expense of procuring The vessel could not be re-coppered at New Orleans; but she might have been rendered seaworthy, at less than 1-2 her value. This is the first time, we believe, that a right to abandon has been set up on a supposed value of repairs which could not be rendered. A vessel is never released from the obligation of pursuing her voyage, if she can be rendered seaworthy at an expense of

ALBANY,
Oct. 1827.

Center
v.
American Ins.
Co. of N. Y.

less than half her value. If this has not been adjudged, it is clearly implied from the cases. The insurance is not on the voyage ; but the ability of the vessel. (4 Cranch. 370.) That repairs to render *her seaworthy are enough, the following cases will imply: *Gould* v. *Shaw*, (1 John. Cas. 293, per Radcliff, J.) *Abbot* v. *Broome*, (1 Caines, 292, 302, per Radcliff, J.;) *Neilson* v. *The Col. Ins. Co.*, (3 Caines, 108; 1 John. Rep. 301, 305, S. C.;) *Wood* v. *The Lincoln & Kennebeck Ins. Co.*, (6 Mass. Rep. 482, per Parsons, C. J.)

The sole and universal ground of abandonment of a vessel, is her incapacity to pursue her voyage. (4 Cowen, 243.) It follows that necessary repairs alone are to be considered. Suppose the copper alone had been stripped off, and no other injury. The ship might have pursued her voyage. Might she abandon because she happened to be in port where she could not be re-coppered at less than half her value ? The assurer is indeed to pay for re-coppering; but not at the port of necessity. It comes in by way of claim for partial loss. (4 Cowen, 234.) It is for the interest of the shipping merchant that the vessel should be repaired, and proceed with the least possible delay. The rule would be most pernicious which should authorize the owner to break up the voyage at an intermediate port, when the ship may be repaired at a moderate expense. (Abbot on Ship., Am. ed. 254, 275.)

[The counsel examined the evidence, contending that the vessel might be made seaworthy, without an expense exceeding 1-2 her value.]

But if the judge was right as to the law, he misdirected the jury as to the fact; and their finding was against the weight of evidence.

The addition of the expense of re-coppering at New York or Havre, we think our opponents will agree, is a mode of computation novel in our jurisprudence. No place other than that of the disaster was, we believe, ever before adopted.

If the rule of law, however, laid down by the judge, was correct, we admit his mode of computation seems highly reasonable; and is probably the true one. But is not the

novelty of the mode of computation, proof of the novelty of the rule on which it is founded?

*The question, upon the evidence, was not left open to the jury. The judge furnished a statement, with hardly an intimation that it could be questioned.

[The counsel went into the proofs, to show that the finding of the jury was against the weight of evidence.]

4. There was no right to abandon on the mere ground that the vessel could not be re-coppered at New Orleans. if the vessel was made competent to perform the voyage, the owners of the cargo could not refuse to re-ship. If the shippers were discharged by this circumstance, it would have been the same had the vessel been within a day's sail of the termination of the voyage. The owner of the vessel is entitled to the possession of the goods, so long as his vessel is engaged in the prosecution of the voyage; and if driven into a port of necessity to refit, he may retain the cargo till she is repaired. The merchant cannot demand his goods unless the vessel is irreparable, or another cannot be procured. If their policy on the goods required a coppered vessel, they should have effected another policy on a vessel without copper.

5. The vessel could not be abandoned on the opinion of surveyors and others at New Orleans. We concede that existing probability of a total loss, is a valid cause of abandonment; and that it is not defeated, though from subsequent and unforeseen events, it should turn out to be partial. But opinion or belief is not enough. It must be justified by facts. (*Dickey* v. *N. Y. Ins. Co.*, 4 Cowen, 222.)

6. The right to abandon was divested by the sale. This is a doubtful point; but we do not mean to abandon it. We cite Moore, 140; Phil. on Ins. 409, 410, 411; 4 Campb. 138; 6 Taunt. 68; 6 Mass. Rep. 478; Condy's Marsh, 562, a. (*n*); 5 Serg. & Rawle, 508; 14 East, 465.

The master may defeat an abandonment by repairing. (*Dickey* v. *The N. Y. Ins. Co.*, 4 Cowen, 222.) Why not equally by a sale? A sale by the master has certainly been

ALBANY  considered as affecting the question of total loss.  (3 Brod.
Oct. 1827.  & Bing. 147; Phil. on Ins. 111.)  It is not pretended that
Center  the sale created the total loss.  This was not assigned as
v.  the cause of abandonment.  Nor could it be made a ground.
American Ins.  (Phil. on Ins. 408, 409.)
Co. of N. Y.

[*575]          *As to the suit on the freight policy.  If the court should
be against a total loss of the ship, the verdict must be re-
duced to the small general average, which we consent the
plaintiff is to recover.

The total loss of the freight did not follow that of the
vessel; because it might have been repaired, and earned
freight; or another vessel might have been procured to
carry on the cargo.  Loss of freight does not necessarily
follow even an actual total loss of the vessel.  The assured
can never recover for freight which it is his duty to proceed
and earn.  If not earned, it is his own folly.  (3 John.
Cas. 97.)  The authorities cited on the other side, merely
show that there cannot be a total loss of freight without a
total loss of the vessel.  But the converse is not true.  If
the shipper had required this vessel to be repaired and
made seaworthy, and carry on the goods, the master must
have obeyed.  The owner's right to abandon the vessel
could not affect this claim.  He of course had a right to
repair and earn freight, though the shipper had objected.
By abandoning, he lost the freight.  The contract with the
freighter can only be dissolved where the repairing is im-
possible, short of the value of the ship.

It is admitted that, generally, the master must procure
another vessel: but not when, as here, he must pay full, or
nearly full freight.  We were struck with the force of this
reasoning, though it has not been sanctioned by any ad-
judged case.  It might be conclusive, if the vessel had
been, in fact, irreparable.  But it might have been repaired.
On the general question as to the freight, we cite 6 Taunt.
68; 1 John. 205; 9 id. 19; 3 id. 97; 2 Cond. Marsh. 586.

*T. A. Emmet*, in reply.  The voyage was properly
broken up.  It is laid down generally, by the books, that
the master may retain, and the shipper cannot demand his

goods, unless the vessel is irreparable, or another cannot be procured. (Com. Code of France, art. 296; Ord. de Mar. Liv. 3, tit. 3, art. 11.) But this is, as to refitting, where the vessel can be repaired quickly. (1 Valin, 651, 653; Laws of Oleron, art. 4, 1 Peter's Adm. *Dec. App. IX; Laws of Wisbury, 1 Peter's Adm. Dec. App. LXXIII; 3 John. Cas. 93, per Radcliffe, J.; 2 Burr. 887.) This doctrine is not impaired by anything in *Griswold* v. *N. Y. Ins. Co.*, (1 John. 205; 3 John. 321, S. C.)

<div style="text-align:right">ALBANY,
Oct. 1827.
———
Center
v.
American Ins.
Co. of N. Y.
[*576]</div>

We think this is a case in which the shipper had an election to receive his cargo, or require the ship-owner to proceed and earn freight. He did elect to withdraw the goods; and it could not, therefore, be the ship-owner's duty to proceed. True, the shipper cannot be compelled to receive his goods, where it is possible and legal for the ship-owner to proceed. But the former may elect to receive them short of this. A master cannot insist on retaining the cargo a long time, till he has completed his repairs. It may be perishable.

Suppose that in this case the master might elect to refit in a reasonable time, or hire another ship. The latter would, in itself, have been a total loss. It must have been on full freight; and would have been the same thing to the underwriters as an abandonment. The vessel was not, and, probably, could not have been made seaworthy till May following the disaster. Was this a reasonable time to wait for re-shipment? The shippers exercised a prudent discretion in withdrawing the cargo.

The owner is certainly not bound to wait till the expenses are ascertained before he abandons. This ascertainment can be only after the repairs are made; and then it is too late to abandon. Probability must be the guide. The ship had returned, and the report of the surveyors was strong, that the vessel was not worth the expense of repairs; the shippers had withdrawn the cargo; and left nothing to contribute to the expense of the voyage, or make it an object to repair. The surveys have weight. (3 Caines, 111, per Livingston, J.) The master should not repair in

ALBANY,
Oct. 1827.

Center
v.
American Ins.
Co. of N. Y.

[*577]

the face of surveys. He may be far abroad; and is the agent of those concerned.

The sale of the vessel was never supposed to take away the right to abandon. (11 John. 293; 9 id. 1.) The acts of the master cannot generally affect that right. Repairing is an exception, it is true; (4 Cowen, 422;) because the ground of abandonment ceases before it is made. Not so *of a sale. The question as to this is only between vendor and vendee; not between assurer and assured. (8 Taunt. 755, per Dallas, C. J.; *Read* v. *Bonham*, 3 Brod. & Bing. 147; 1 John. 355, charge of Livingston, J.) It is enough, however, by these authorities, that the master acts in good faith. In this view, the sale (being valid) was itself an additional cause of abandonment.

Under the French law, our surveys alone would warrant an abandonment. (1 Valin, 651. 1 Emerigon, 576, 577, 579, 580.) With us they have no official force; but are considered as properly influencing the conduct of the master. Fairly made and pursued, they are evidence of his good faith. (Whart. Dig. 336, art. 175. 11 John. 293, charge of Kent, C. J., in which the court concurred. 8 Taunt. 755. 2 Stark. 571. *Read* v. *Bonham*, 3 Brod. & Bing. 147. *Cambridge* v. *Anderson*, 2 Barnw. & Cressw. 691. *Robertson* v. *Clark*, 1 Bing. 445.) These cases show not only the force of a survey; but that the master is to be governed by probabilities in his conduct, and the owners in abandoning. Some of them speak of necessity; but this means expediency. (5 Esp. Rep. 65.)

The underwriter cannot prevent an abandonment by showing that less than 1-2 the value of the vessel would make her seaworthy. The plaintiff is entitled to have her placed in *statu quo*. (3 Caines, 89, per Livingston, J.) This the assurers must do even as a partial loss. It is implied in the term repair; which is "to amend an injury by an equivalent." (John. Dict.) The estimate of the vessel's value to be made in reference to the port of necessity. (2 Caines, 85.)

The vessel could not be repaired at New Orleans. No copper could be obtained. The incapacity to repair, either

for want of funds or necessary materials, has always been held cause of abandonment. The plaintiff had a right to abandon the voyage; and demand repairs on the spot from the underwriters. If this cannot be done, he may abandon. If wood alone may be employed in case of necessity, the money value of the copper must be added to make up the loss. This would still entitle to the abandonment.

*The finding of the jury (and it is fully supported by evidence) is, that if the value of the coppering at any place be added to the other repairs, they will exceed a moiety of the value.

[*578]

If the ship be not rendered unseaworthy by the injury, her delay would be a deviation; as in the case supposed on the other side, of mere loss of copper, without other injury.

All antecedent defects not making the vessel unseaworthy, are to be disregarded. (2 Caines, 85; 5 Cowen, 53.)

In England, the rule that a loss of more than 1-2 of the thing, (2 Burr. 1209,) or the ship, (*Goss* v. *Withers*, W. Bl. 279, 322; 2 Burr. 696, 697,) amounts to a total loss, constructively, in a case of salvage of a ship on re-capture. A loss by any other peril is the same in principle. Traces of the same rule in regard to losses by other perils may be found in the English books. (1 T. R. 187, per Willes, J., viewed in the same way by Tilgman, C. J., 3 Serg. & Rawle, 45, and by this court in 3 John. Cas. 84. And see *Read* v. *Bonham*, 3 Brod. & Bing. 147.) As to the French rule on this head, see 2 Valin, 101.

The rule is generally so expressed as to refer to the value of the vessel, and amount of repairs at the port of necessity. (Phil. on Ins. 389, 390. 6 Mass. Rep. 682. 1 Con. Rep. N. S. 235. 2 Caines, 85. 4 Cowen, 242, 245.) It is only on that ground that the deduction of 1-3 new for old is proper. The object is, to ascertain whether the voyage be worth pursuing. If the property be merchandize, for sale, its market price in an injured state, is compared with its price in an uninjured state. If the damage be to the vehicle of transportation, the question whether the voyage be

ALBANY
Oct. 1827.
_____

Center
v.
American Ins.
Co. of N. Y.

[*579]

worth pursuing, depends on the expense of repairs, compared with the value when repaired. The values should be taken in the same place. No question has ever been made upon this before; and there is nothing about it unsettled, except whether the value in the policy shall be taken for that of the ship.

The value of the ship at the port of necessity, not the value in the policy, should be taken. The latter is never *intended to conclude on the question now raised. It is lawful to recover by it much more than the value of the vessel; as the value of provisions and outfits. (4 T. R. 206.) The value at the port of necessity has usually been adopted. (11 John. 293.)

*Curia.* In the suit upon the vessel policy, the plaintiff claims to recover for a constructive total loss, founded on sea damage to more than a moiety of the ship's value, after the usual deductions. On the trial, the parties assumed the valuation of the vessel in the policy, which was 10,000 dollars, as the measure with which the cost of repairs is to be compared, in order to determine whether it exceeded one half the value of the ship.

Whether the proper principle of estimating the moiety was adopted at the trial; and, if so, whether the sale before abandonment rendered that abandonment invalid, are the only questions of law necessary to be considered in the vessel cause, according to the view which we have taken of it.

The Pallas was originally sheathed with copper. Her disaster rendered a re-sheathing necessary. The defendants' counsel urged, that if she could be rendered seaworthy, and fully competent to perform the voyage, by repair amounting to less than the moiety, as by a sheathing with plank instead of copper, the plaintiff had no right to abandon. And they insisted on the question being put to the jury in that shape. The counsel for the plaintiff contended that the legal measure of repairs was, what would place the Pallas in *statu quo.* And so the judge decided

charging definitely, that the re-coppering made a part of the repairs.

It is abundantly settled, as a general rule, "that if the ship or goods insured, be damaged to more than one-half of the value, by any peril insured against, the assured may abandon, and recover for a total loss." (Phil. on Ins. 401, and the cases there cited.) Such deterioration is a substantive ground of abandonment. And the only question made on this head, relates to the meaning of *the words in the rule, "one half of the value." Is it one half of the ship's value for the purposes of the particular voyage; or of the general market value? A vesssel competent to cross the Atlantic with a full cargo, is insured for a short trip from one port to another in the same hemisphere; and meets with a ruinous disaster to nearly her full value. With some slight repairs, she may be rendered adequate to her particular duty. Have the insurers a right to insist on those repairs being made; and thus avoid payment for a total loss? Is the insurance on the ship, or on the voyage? If we do not look to the simple abstract value of the ship, what becomes of the rule? Are we not thrown upon what is contended to be the English doctrine? We are made in all cases dependent on foreign considerations; such as the length and hazardous nature of the voyage. The unmixed value of the ship, and the comparative value of repairs, were adopted by the American courts, to avoid complication and uncertainty. Insurance is an obligation of indemnity. The insurers are bound to repair the ship, that is, to amend or restore her, as the term imports; or, in the language of Mr. Justice Livingston, in *Depeyster* v. *The Col. Ins. Co.*, (3 Caines, 85,) " to defray all expenses of placing her in *statu quo.*" When and where is this to be done? We answer, at the port of necessity. The insurers have no right to split the repairs into parts; and say the seaworthy portion for the particular voyage shall be performed at that port; and the residue at the port of destination, or elsewhere. The obligation to repair on the spot is absolute. The voyage may never be completed. Disaster, deviation, or breaking up of the voyage by consent, would

[*580]

ALBANY,
Oct. 1827.

Center
v.
American Ins.
Co. of N. Y.

enable the underwriters to escape the subsequent repairs entirely. In any view, we are satisfied the value of repairs intended by the rule in question, is the expense of fully reinstating the vessel; and generally with the same kind of materials of which she has been deprived by the disaster. The decision of the judge was, therefore, correct in point of law.[1]

[1] It is understood, says Mr. Kent, to be a fixed rule, that if the ship be so injured by perils as to require repairs to the extent of more than half her value at the time of the loss, the insured may abandon; for if ship or cargo be damaged so as to diminish their value above half, they are said to be constructively lost. The rule came from the French law, and is to be found in the treatise of Le Guidon, (Condy, c. 7, arts. 1, 9,) where it is applied to the case of goods; and in respect to both ship and cargo, the rule has been incorporated into the American jurisprudence. (Valin's Com. tome ii. 101; Pothier, de Ass. n. 121: Code de Commerce, art. 369.) There has been considerable discussion in the text books, as to the right to abandon, when a part only of the property insured is damaged above a moiety, or lost, and this will depend upon the manner in which it is insured. If the insurance be upon different kinds of goods indiscriminately, or as one entire parcel, it is then an insurance upon an integral subject, and an abandonment of part only cannot be made. But if the articles be separately specified and valued, it has been considered so far in the nature of a distinct insurance on each parcel, that the insured was allowed to recover as for a total loss of the damaged parcel when damaged above a moiety in value. Mr. Phillips has suggested a doubt whether this distinction be well founded. The rule was taken from the French treatises, and unless the different sorts of cargo be so distinctly separated and considered in the policy, as to make it analogous to distinct insurances on distinct parcels, there cannot be a separate abandonment of part of the cargo insured. *Guerlain* v. *Columbian Ins. Co.*, 7 Johns. Rep. 527.

The meaning of the words in the rule, "one-half of the value," has been held to be, the half of the general market value of the vessel at the time of the disaster, and not her value for any particular voyage or purpose. (*Brralie* v. *The Maryland Ins. Co.*, 12 Peters, 378.) The expense of the repairs the port of necessity, including the expense of getting the ship afloat, stranded, is the true test for determining the amount of the injury, and such sum is to be taken as will fully reinstate the vessel, and, in general, with the same kind of materials of which she was composed at the time of the disaster. It has also been considered that the three objects of insurance, vessel, cargo and freight, stand on the same ground as to a total loss by a deterioration more than one-half of the value. (*Center* v. *American Ins. Co.*, 7 Cowen Rep. 564.

In ascertaining the value of the ship, and the *quantum* of expense or injury, difficulties have arisen, and they were fully discussed, and very clearly

Was the question of fact, under this principle, fairly put to the jury? The Pallas could not be fully repaired at New Orleans, for want of copper: but this might have been obtained at Havre or New York. The charge of the judge is treated by the counsel for the defendants as adopting New Orleans prices for the repairs in wood, and the New York price for the copper sheathing; thus looking beyond both the port of necessity and destination for a part of the repairs. This is said to be an unprecedented basis of estimate; and if intended by the judge in that view, it might have been unwarrantable. But it was certainly most favorable for the defendants. We understand the judge as entertaining a strong impression against them; and as vindicating it by taking the most favorable side, their own evidence, to show the failure of the defence, even upon their best possible ground. He takes the testimony of their best informed witness, Seguin, one of the surveyors, and the master carpenter who repaired the Pallas for the purchaser. From this he measures the value of repairs in wood at New Orleans. He then supposed the ship

explained, (in *Peele* v. *Merchants' Ins. Co.*, 3 Mason's Rep. 70, 78.) The valuation in the policy is conclusive in case of a total loss; but in some respects, is inapplicable for the purpose of ascertaining the *quantum* of injury in case of a partial loss of goods. The rule in that case is, to ascertain the amount of injury by the difference between the gross proceeds of the sound and damaged goods. (*Johnson* v. *Sheddon*, 2 East's Rep. 581.) This is also the true rule as to the ship, though there is greater difficulty in the application. The value of the ship at the time and place of the accident, is the true basis of calculation. (*Patapsco Ins. Co.* v. *Southgate*, 5 Peters' U. S. Rep. 604.) And with respect to the arbitrary and fluctuating rule as to the allowance of one-third new for old, there is no doubt of its application in cases of partial loss; but such a deduction is not allowed, and does not apply to cases of total loss. (*Peele* v. *The Merchants' Ins. Co.*, 3 Mason's Rep. 28, 77.) The reason of this allowance to the underwriter, one-third of the expense of the reparations, is on account of the better condition in which the ship is put by them, than she was when insured, and the owner, when he comes again into the possession of his vessel, receives the benefit of the repairs. But neither the reason of the rule, nor the rule itself, applies to the case of a ship suffering a partial loss on her first voyage, when she is new, and cannot be made better by repairs. (In *Pirie* v. *Steele*, 8 Carr. & Payne, 200.) The half value which authorizes an abandonment, is half the sum which the ship, if repaired, would be worth, without any such deduction. (*Dupuy* v. Ins. Co., 3 Johns. Cas. 182.)

ALBANY,
Oct. 1827.

Center
v.
American Ins.
Co. of N. Y.

repairable by the copper sheathing at New York; a place where it would certainly be much cheaper than at New Orleans, even if copper could have been obtained there at the usual price. In this way, he still makes the repairs deducting one third new for old, and the value of the old copper, overrun one half of the agreed value of the ship.

The evidence as to the amount of repairs consists mainly in the extract from the preliminary proofs, and the estimates made upon this by Mr. Hicks, the broker; to be compared with the evidence given in chief by Fosdick, Russell, Seguin, Southerland, Gleazer and Eckford. The whole was submitted to the jury; having first been open to, and undoubtedly having undergone the criticisms of counsel. The question was one of fact; and peculiarly within the province of the jury. The evidence was conflicting to a certain degree. But we do not see how any man who reads it, can escape the strong impression which the judge communicated to the jury; and which we think he was justifiable in communicating. If we differed both from judge and jury, we should hardly feel authorized to grant *a new trial, unless the verdict were clearly against the weight of evidence.

[*582]

The ship was sold four days previous to the abandonment. In this there cannot be a doubt the agents acted with perfect good faith. The surveys concurred in recommending a sale; and there was already a constructive total loss; or what would be so upon abandonment. We incline to think the captain had power to sell under these circumstances. (Phil. on Ins. 401, 411, 412.) But if he wanted the power, we do not think this could affect the right to abandon. If he acted tortiously, the interest acquired by the defendants is in the ship. All their rights are saved. In general, the master cannot impair the right to abandon by any thing he does. The act of repairing is considered an exception. He may in his discretion repair; and when that is done, and the vessel fairly on her voyage, the right of abandonment is taken away. (4 Cowen, 422.) He is acting in the line of his duty and power; and the ground of abandonment is removed before it is made. Not so here.

The sale, if it had any effect, would seem rather to strengthen than impair the right to abandon.

The only remaining questions arise upon the freight policy. It is settled that the abandonment of the ship does not affect the remedy for loss of freight. (Phil. on Ins. 428, 429, 430, and the cases there cited.) It is not denied, however, that another vessel could have been procured to carry on the cargo from the port of necessity. When this can be done, it is, in general, the duty of the master to tranship the cargo, and earn freight. If he neglect to do so, it has been held that the insurers are not liable. (*Saltus* v. *The Ocean Ins. Co.*, 12 John. 107. *Bradhurst* v. *The Col. Ins. Co.*, 9 John. 17.) The failure to earn freight is imputed, in such case, to the assured, through his agent, the master. The charter party of affreightment is not dissolved; and the underwriters are entitled to its execution, in order to be protected against a total loss if possible. No freight is, in strictness, due, until the goods reach the port of destination; unless they are voluntarily *accepted at the port of necessity; or there be a refusal, upon offer made, to have the goods sent on in another vessel. (*Bradhurst* v. *The Col. Ins. Co.*, 9 John. 17, per Kent, Ch. J.) These are the principles on which the master is bound to proceed. We lay out of view the fact that the vessel might have been made seaworthy short of an expense to one half her value, and have taken in the cargo; because the assured, having a clear right to full repairs, was entitled to abandon. This, we have seen, while it puts the vessel beyond his control, is not to interfere with the claim for loss of freight. The obligation to earn freight must have had reference exclusively to the employment of another ship. But *cui bono*, in this case, employ another vessel? Here had been no progress in earning freight. The vessel is driven back with the cargo to her port of departure; where she lies as a wreck, and is sold for the benefit of those concerned. The cargo is unladen, and finally received by the shippers. It seems to us that here was a loss of freight absolutely total. We cannot intend that the hire of a vessel for the same voyage, would have

[*583]

ALBANY;
Oct. 1827.

Center
v.
American Ins.
Co. of N. Y.

been at a freight less than that stipulated for in the original charter party. There was, in truth, nothing to abandon. (Phil. on Ins. 382, 386, and the cases there cited.) There could be no salvage. It is strongly intimated in *Green* v. *R. E. Ass. Co.*, (6 Taunt. 68,) that in a case like the present, no abandonment is necessary, as there is nothing to be transferred by the assured to the insurer.[1]

[1] It has been a very controverted question, says Mr. Kent, (3 Com. 333, *et seq.*) whether an abandonment of the ship transferred the freight in whole or in part. It was finally settled in the jurisprudence of New York and of Massachusetts, and adopted as the true rule in the Circuit Court of the United States for Massachusetts, that on an accepted abandonment of the ship, the freight earned previous to the disaster was to be retained by the owner, or his representative, the insurer on the freight, and apportioned *pro rata itineris;* and that the freight subsequently earned went to the insurer on the ship. (*United Ins. Co.* v. *Lenox*, 1 Johns. Cas. 377.) In the case of (*Armroyd* v. *Union Ins. Co.*, 3 Binney's Rep. 437,) the question was raised, but left undecided, whether the entire, or only a *pro rata* freight, in such a case, went, on abandenment, to the insurer of the ship. This litigated question has now been settled in England; and in (*Case* v. *Davidson*, 5 Maule & Selw. 79,) where ship and freight were separately insured, and each subject abandoned as for a total loss, it was adjudged that the abandonment of the ship transferred the freight as an incident to the ship, and that an abandonment was equivalent to a sale of the ship to the abandonee. The French jurisprudence on this subject has been equally embarrassing and unsettled. The ordinance of 1681 had no textual regulation relative to freight, in cases of abandonment. It was left to the decisions of the tribunals, and they denied to the insurer on the ship any freight for the goods saved. Valin exposed the error, (Com. liv. 3, tit. 6; Des Assurances, art. 15,) and maintained that freight on abandonment, whether paid in advance or not, ought to go to the insurer. In 1778, it was settled at Marseilles, under the sanction of Emerigon, that freight was an accessory to the ship; and in abandoning the ship, the freight acquired during the voyage went with it. (Emerigon, tome ii. 217, 227.) The ordinance of 1779 followed that doctrine, and declared that acquired freight already earned on the voyage, was insurable, and did not go with the ship on abandonment, but that the future freight to be earned on the goods saved, would go to the insurer, if there was no stipulation to the contrary in the policy, save the wages of seamen and bottomry liens. The new code (Code de Commerce, art. 386,) declared that the freight of goods saved, though paid in advance, went, upon abandonment, to the insurer on the ship. The construction given to the code by the royal court at Rennes, in 1822, in the case of (*Blaize* v. *Company of General Assurance at Paris*, was, that the future freight did not go to the insurer on the ship, but only the freight on the goods saved and already earned at the time of the loss. (Boulay Paty, tome iv. 397, 417.)

But suppose this vessel is to be considered as having proceeded on her voyage, pursuant to the contract with the shippers. She met with a disaster which broke up that voyage. More than one half of her freight was gone at all events; and the assured abandoned as for a total loss to the underwriters. The principles of constructive total loss are applicable to freight. Even supposing a *pro rata* freight actually earned to less than one half of the whole, we should think the assured might abandon; thus throwing the whole loss on the underwriters; crediting them with what is earned by the lost ship as salvage. Take the case of a ship lost at an intermediate port of necessity. *The shippers may elect to receive their goods, and pay *pro rata* freight. (6 Cowen, 504.) It amounts, however, to but one fourth of the sum stipulated in the charter party. May not the assured abandon? This is usually a question of no importance; for when the *pro rata* freight is paid, it is the same thing to the underwriter, whether there be an abandonment or not; whether the loss be considered partial or total. If it be not paid, and the collection is thrown upon him, it makes a difference, provided the shipper prove unable to pay. We see no objection to an abandonment in either case, upon the principles that govern where ship or goods are deteriorated to more than a moiety of their value. But we are not without direct authority. In the case of *Whitney* v. *N. Y. Fireman's Ins. Co.*, (18 John. 210,) there was an abandonment upon an insurance on freight. The plaintiff recovered; and one reason assigned was, that a vessel could not be procured for half the freight valued in the policy to carry on the cargo. It may be safely asserted, that when the vessel is disabled, so that she cannot proceed on the voyage, the insured on freight may abandon as for a total loss, when another ship cannot be procured for less than half the freight in the policy. The three cases of ship, cargo and freight, seem to rest on the same principle. The master discharged his duty. The shippers elected to receive the cargo. In this case they acted prudently in doing so; and the underwriters are not injured by the act.

[*584]

<div style="float:left">ALBANY,<br>Oct. 1827.<br>———————<br>Coates<br>v.<br>The Mayor, &c.<br>of New York.</div>

The plaintiff is, therefore, entitled to recover in both causes, as for total losses.

New trial denied in the first cause.

Judgment for the plaintiff in the second, on the verdict.

---

[*585]          *COATES *against* THE MAYOR, ALDERMEN, and COMMON-ALTY of the city of New York.(a)

*South Trinity Yard.*

*A statute, (2 R. L. 445, s. 267,) declared to be a public act, authorized the corpora-*