## Case No. 6,372.

### The HENRY.

[Blatchf. & H. 465.] [1]

District Court, S. D. New York. Dec. 31, 1834.[2]

SALE OF STRANDED VESSEL—AUTHORITY OF MASTER—SURVEY—EVIDENCE OF NECESSITY—FREIGHT—REPAIRS BY PURCHASER.

1. A sale of a vessel by a master, virtute officii, for the benefit of all concerned, is not conclusive, but may be reviewed in admiralty, and the burden of proof will be on the purchaser to show, as against the former owner, that the sale was both bona fide and necessary. The meaning of the term "necessary," examined.

[Cited in Fitz v. The Amelie, Case No. 4,838; The Raleigh, 37 Fed. 126.]

2. It seems that, in respect to the validity of such a sale by the master, the rule is the same, whether the question arises between the owner and the purchaser, or between the insured and the underwriter.

---

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

[2] [Reversed by circuit court; case unreported.]

3. A survey of the vessel, under oath, prior to the sale, if not indispensable, is highly important as evidence to show the necessity and good faith of the sale.

4. A paper purporting to be a survey, but not drawn up, subscribed or sworn to prior to the sale, will not be received as evidence of a survey.

5. The facility with which a stranded vessel was reclaimed by the purchaser, after the sale of her by her master, is evidence in regard to the good faith of the master and the necessity of the sale.

6. A special agent must act in the name of his principal, and according to the terms of the authority conferred upon him.

7. The mere presence of an agent of the owner of the vessel, at the sale of her by her master, does not constitute the sale any the less a sale by the master.

8. Evidence of the receipt, by a special agent of the owner of a vessel, or the proceeds of an unauthorized sale of the vessel by her master, does not afford a presumption that the sale was ratified by the owner.

9. Where, in the case of an unauthorized sale of a vessel by her master, in a foreign port, restitution of the vessel, or the amount of her value on her arrival home, is decreed to her former owner, the purchaser at such sale will be allowed the amount of the necessary repairs put upon the vessel to fit her for sea, and the expenses of navigating her home, and the price paid for her, on such sale, to the agent of the owner.

10. The right to the freight earned upon the homeward voyage follows the ownership of the vessel.

11. The bills of lading are only prima facie evidence of the amount of cargo upon which freight is to be estimated.

[See Backus v. The Marengo, Case No. 712.]

12. Repairs and betterments put upon the vessel in her home port by the purchaser, before notice of the former owner's claim, will be allowed to the purchaser out of the proceeds of the vessel, if any remain after the other accounts are adjusted.

This was a possessory action. The libellants were owners of the brig Henry, and, in April, 1832, despatched her to Matamoros, in Mexico, with Daniel Moss as master, and Jason St. John as supercargo and agent, giving a power of attorney to St. John "to employ the vessel, or to make sale of her, in the name, place and stead of the libellants, in case a fair price could be obtained." Moss was unable, from sickness, to return with the vessel, and one Titterton was substituted as master in his place. In getting out of the harbor of Matamoros the vessel ran ashore and was stranded upon a sand-bank. There was a great deal of evidence on both sides as to the degree of danger to which she was exposed, similar cases of vessels grounding in that vicinity were adduced, and it was proved that Titterton himself had before been wrecked on that coast. The master abandoned the vessel the same day she ran aground, and ordered her to be sold in three days. A paper was put in evidence in the case, signed by three ship-masters at Rio Grande, and verified before the United States consul at Matamoros, in these words: "At

the instance of William Titterton, master, we went on board the hermaphrodite brig Henry, of New-York, to examine the said vessel, and, having carefully and particularly inspected, examined and surveyed the said brig, report her to be stranded and bilged, with a great quantity of water, and unfit to be got off, and, therefore, we recommend the said brig to be sold for the benefit of the concerned." This paper was dated the 5th of July, and sworn to on the 7th, which was the day of the sale; and there was evidence that it was not subscribed or sworn to until after the sale. The brig was sold at auction. The master superintended the sale. St. John was present, and made no objection to it. One Irwin bought the vessel for $80, and sold her again, for the same sum, to the vendor of the claimants. The purchase-money for the brig was received by St. John, but it did not appear whether he had ever paid it over to the libellants. Eleven days after the sale, the vessel was got off, and was discovered to be not materially damaged. Such repairs as were necessary for her preservation were put upon her at Matamoros, and she arrived at New-York in October, 1832. with the same cargo which she had on board when she ran aground. She was sold to the claimants at New-York, and was by them put upon the railway to be repaired. The libel was filed in January, 1833, and prayed that the vessel, or her value, and the freight earned, might be decreed to the libellants. The claimants excepted to the jurisdiction of the court, and prayed restitution of the vessel and freight. She was afterwards bonded by the claimants, on an agreed valuation of $3,500. It was contended by the libellants that the sale was invalid, and that no title passed by it. The claimants urged, that the master had, under the circumstances, competent authority to sell the vessel, and that the sale was valid; that, as St. John, the agent of the libellants to sell the vessel, had concurred with the master in the sale, it had the same effect as if he himself had made the sale; and that the receipt of the purchase-money by the agent of the libellants amounted to a ratification of the sale. The authorities and the arguments are fully considered in the opinion of the court.

John Duer and William Kent, for libellants.

George Griffin, James W. Gerard, and Benjamin Haight, for claimants.

BETTS, District Judge. The libellants in this case produce a complete documentary title in themselves to the brig Henry, which entitles them to prevail, unless the claimants can show a paramount title out of them, or derive one through them. The title of the claimants rests upon a sale of the vessel, by the master, in the port of Matamoros, and it devolves on them to establish the validity of the sale, and the sufficiency of their title under it. The master of a vessel has complete authority in every thing relating to the management and conduct of his vessel; but it is apparent that no general authority from his owners to sell her can be implied. When, therefore, a master first assumed the power to sell his ship, virtute officii, under any exigency whatever, the English courts denied his authority, and refused to recognise the validity of the title thus acquired. Tremenhere v. Tressillian, 1 Sid. 452; Johnson v. Shippen, 2 Ld. Raym. 982. And these views received the approbation of the court at a much later period (Reid v. Darby, 10 East, 143; Hunter v. Prinsep, Id. 378) although some nisi prius cases before Lord Ellenborough seem to import a yielding of the general principle (Hayman v. Molton, 5 Esp. 65; Underwood v. Robertson, 4 Camp. 138). The rule has now been relaxed, or has assumed a new form, so that it is admitted in England that the master may, by the maritime law, sell his vessel in case of wreck or irreparable disaster. The Fanny and Elmira, Edw. Adm. 117; Maeburn v. Leckie, cited in Abb. Shipp. (Ed. 1829) p. 6; Cannan v. Meaburn, 1 Bing. 243; Idle v. Royal Exchange Assur. Co., 8 Taunt. 755; Read v. Bonham, 3 Brod. & B. 147; Freeman v. East India Co., 5 Barn. & Ald. 617. And the law of England conforms, in this respect, to that of other maritime countries. Pardessus, Cours de Droit Comm. pt. 4, tit. 1, c. 3, § 2; 1 Emerig. Ins. tit. "Innavigability"; Valin, Comm. sur l'Ordonnance, liv. 2, tit. 1, art. 19; Id. liv. 3, tit. 6, art. 46; Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 604; 3 Kent, Comm. 173, note. But the qualifications attached to the power manifest the caution and distrust with which its admission was ultimately yielded by the courts. The cases demand the existence of an extraordinary and paramount necessity to justify a sale, and refuse to uphold it unless it is resorted to only in the last extremity. The American and English cases coincide in one rule, as applicable to this subject. The master's agency to sell, arising by operation of law and being exercised by him virtute officii, both necessity and good faith must concur, to render the sale by him valid. Abb. Shipp. (Ed. 1829) 10, 244, note; Reid v. Darby, 10 East, 143; Hayman v. Molton, 5 Esp. 65; Underwood v. Robertson, 4 Camp. 138; The Fanny and Elmira, Edw. Adm. 117; 3 Kent, Comm. 173, note; The Tilton [Case No. 14,054]; Hall v. Franklin Ins. Co., 9 Pick. 466; American Ins. Co. v. Center, 4 Wend. 45; Center v. American Ins. Co., 7 Cow. 564, 582; Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 604, 621. Neither necessity nor good faith is alone sufficient to make valid a sale by the master which is offered as a bar to the title of the previous owner. Both must concur, and must be affirmatively shown by the party setting up the sale; and the courts will not infer the existence of either of these requisites from the most ample proof of the other. Chancellor Kent expresses the rule deducible from the authorities to be, that if the voyage be broken up in the course of it

by ungovernable circumstances, the master may sell the ship, provided he do so in good faith, for the good of all concerned, and in a case of supreme necessity which sweeps all ordinary rules before it (3 Kent, Comm. 173); and the spirit of this statement of the master's authority is supported by the supreme court of the United States (Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 621).

This term "necessity," which at the same time creates the power and marks its limitation, is not itself of any very distinct or definite signification. The epithets annexed to it as qualifications, in most of the cases, indicate the anxiety of the courts to restrain the power within severe limits, but do not assist in removing the vagueness and uncertainty of the term itself. What test is the court to employ in determining when, in point of law, this necessity becomes absolute, paramount or extreme? Practically, these epithets serve only to administer an impressive caution to courts and jurors, to demand clear proof that the necessity is actual and not merely apprehended or one which, upon a balancing of chances, may turn out to be absolute and real, or only threatening and imaginary. The tribunal which passes upon the facts must determine, upon its own best judgment, in view of all the evidence, whether the necessity was actual and justified the sale, because the principles applicable to the subject do not, from their nature, admit of any more precise standard. The qualifying phrases which the books annex to the rule can only avail as appeals to the sound discretion of the court or of jurors, in a given case, and not as of themselves presenting any distinct particular to be ascertained, or as affording any definite or practical limitation to the power. Wherever an actual necessity exists, the power is conferred, equally when that necessity presents itself in its simplest form, and when it is most imminent. Some cases seem to incline towards taking a distinction between sales which are to be deemed operative between insurer and insured, and those which are to conclude the owner as against the purchaser. The Tilton [Case No. 14,054]; Center v. American Ins. Co., 7 Cow. 577, 582; Idle v. Royal Exchange Assur. Co., 8 Taunt. 755; Holt, Shipp. (2d Ed.) 250. It is not necessary to the decision of this case, that I should pass upon the solidity of this distinction; but I am persuaded that principle and authority are opposed to any further relaxation of the rule, and that the same necessity and good faith which are required when the question arises between the owner and the master or purchaser, must exist to give validity to the sale as between the underwriter and the insured. So far as the case of Center v. American Ins. Co., 7 Cow. 582, 4 Wend. 45, indicates a different principle, it may be considered as controlled by the decision in Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 621.

The law has not settled what precise mode or degree of evidence is sufficient to prove the existence of the necessity which is thus made the first requisite to the validity of all sales of a vessel by her master. The judgment and determination of the master himself, no matter how careful his consideration of the circumstances of the case may have been, is manifestly not conclusive upon the subject. His decision is subject to review in the home tribunals, and he or the party who claims under his acts must sustain that decision. Nor is the opinion of bystanders, however intelligent, disinterested and unanimous they may be, adequate proof of the accuracy of the decision. The law adheres to the ordinary rules of evidence in this matter, and requires proof of the facts and circumstances themselves in view of which the master decided, in order to a determination whether his decision was correct. The wise precaution of the maritime law has, however, pointed to one item of proof, which, if not necessary, will, nevertheless, be demanded, unless its absence be satisfactorily accounted for; and that is, a precedent examination of the vessel by competent surveyors, and their report, stating her condition, and advising a sale. Gordon v. Massachusets Ins. Co., 2 Pick. 249; The Tilton [supra]; Cort v. Delaware Ins. Co. [Case No. 3,257]; Fontaine v. Phoenix Ins. Co., 11 Johns. 293; Idle v. Royal Ins. Co., 8 Taunt. 755. Such a survey answers the salutary purpose of checking precipitation on the part of the master under circumstances well calculated to disturb his judgment, and gives him authentic evidence to guide him in determining whether the condition of his vessel be desperate or not. He is by no means bound to adopt the opinion of the surveyors advising a sale, nor, if he does follow it, will it, of itself, justify his proceeding to a sale. Hayman v. Molton, 5 Esp. 65; Abb. Shipp. (Ed. 1829) 8–11. Still, a survey by competent surveyors, containing a clear statement of the injury, and a strong recommendation to sell, will be an important element in the proofs, in determining the character of the emergency and especially the good faith of the master. The Fanny and Elmira, Edw. Adm. 117; The Tilton [supra]; Gordon v. Massachusetts Ins. Co., 2 Pick. 264. Independently of all authority on the point, the use the survey is to subserve plainly indicates, that it should be deliberately made and should precede the action of the master. It is not intended to be laid down as a fixed rule, that the surveyors must be sworn before they proceed to act. Still, it will add greater weight and credibility to their decision, if all their examinations and consultations are under the solemnity of an oath. At all events, when their report is submitted to the master and he proceeds to act upon its testimony, it should have the sanction of the oaths of the surveyors, if they can be legally administered at the place of the survey.

In view of these principles, the survey offered in evidence in this case is substantially defective in every particular necessary to constitute it a safe or proper guide to the decision of the master. It would have been easy for him to have called together persons competent and properly qualified to make a survey, and to have had their proceedings duly authenticated. But the evidence shows, that the paper offered here as a survey was not subscribed or sworn to until after the master had concluded to sell, and probably not until after the sale had actually taken place. Moreover, it appears upon the evidence, that the persons who signed the paper were not called to the vessel to act as surveyors; nor did they make any joint examination of her, nor did they ever consult together with a view to a report, nor did they all individually inspect her in a way to enable them to form a sound opinion as to her condition. If, then, in circumstances like the present, where there is no impediment in the way of a competent survey of the vessel, either from the want of surveyors or from the imminency of the peril, a master cannot legally proceed to sell his vessel without instituting such a survey, it follows that Titterton exceeded the bounds of his authority, and the claimants, who make title under this sale, must fail in consequence. But even if a master may, on his own judgment of the exigency of the case, sell a vessel, without regard to a survey, it cannot be denied that this power is not absolute, but is subject to review, when those whose interests have been affected by his acts sue before the proper tribunal to reclaim their rights. It will then devolve upon the party who upholds the proceedings of the master, to prove the circumstances necessary to confer the power, and the faithful execution of the power so created. Without recapitulating the evidence in this case, it is enough to say, that the master did not attempt those exertions to save the vessel which he was bound to make. He gave her up as hopeless as soon as she stranded, before the injuries sustained could have been understood, and without making reasonable efforts to ascertain them. He presumed she had bilged, but had no adequate reasons for that conclusion. The average experience in respect to vessels grounding in that vicinity may have been, that they could not be got off, and this the master may have been aware of, from having been familiar with the coast, and from having been once previously wrecked there himself. But he cannot be excused because the circumstances were discouraging, for not having made earnest efforts to save his vessel. Besides, two cases could hardly occur of vessels grounding under precisely similar circumstances. The wind, the currents and tides, the force of striking, the weight of the vessels and other circumstances, would always present distinctions which would prevent one case from offering a rule of conduct applicable in all respects to another.

The evidence does not mark this as a case of extreme necessity. The vessel was very strong, and lay upon a sandy bottom, so soft that the chief danger apprehended seemed to be, that she would gradually become imbedded in the sand. The state of the wind was not such as to expose her to instant peril; and there were several American merchant vessels in the vicinity, and an American armed ship anchored a few miles off. She struck, moreover, at the edge of the harbor, from which she had just cleared. Her lading was got off in a few hours, and then, without an endeavor to procure relief or assistance from the shore or from neighboring vessels, the master gave her up as desperate, and ordered her sale in three days. Eleven days after the sale, the purchaser, with the application of ordinary means, raised the vessel, and she was then found not to have received any fatal injury. It is true, that this result is not to be considered conclusive as to the propriety of the conduct of the master. Idle v. Royal Exchange Assur. Co., 8 Taunt. 755; Fontaine v. Phoenix Ins. Co., 11 Johns. 295. A sale is not to be invalidated merely because the vessel is afterwards rescued. The case is to be judged of by the circumstances as they must have appeared at the time, and not by the subsequent event. Still, the result is an element in the evidence, to assist in determining whether the condition of the vessel ought reasonably, at the time, to have been deemed hopeless, and may, in this manner, become a circumstance of weight in deciding whether the master acted in good faith to his employers. So far, then, as the validity of the sale under which the claimants make title rests upon the authority of the master to sell, I must, under the facts in proof, hold that they have failed to show that junction of necessity and good faith, by which alone such authority can be established.

It is next contended by the claimants, that since the supercargo, with a power of attorney from the owners to sell the vessel, was present and assented to the sale in question, his acts in relation to the sale constitute it, in point of law, a sale under the power, and that, accordingly, the claimants derive a complete title in that manner, without regard to the authority or acts of the master. If the supercargo had sold, he would have done so under no authority arising by operation of law. The master sold virtute officii, in his own name, as clothed with the possession of the article, and with the power to sell pro hac vice, and not by the direct act or assent of the owner, but by authorization of law. The supercargo, however, would have acted as a mere agent for his prin-

cipal and in his principal's name. Passing by the question, whether a vessel can be sold by an agent, so as to pass a title good against her former owner, without the ordinary evidence of a bill of sale for and in the name of the principal, or, whether a sale and delivery of a vessel, without a bill of sale, are good only between the owner and the purchaser personally,—3 Kent, Comm. 130, note; Abb. Shipp. (Ed. 1829) 1; The Tilton [Case No. 14,054]; Ohl v. Eagle Ins. Co. [Id. 10,473]; The Sisters, 5 C. Rob. Adm. 155; Holt, Shipp. 183; Jac. Sea Laws, 17, 57,—I am satisfied, upon the proofs, that the master himself assumed the power to sell, and proceeded to carry it into execution, without referring to any authority of the agent of the owners. It is not claimed that the sale was made directly by the agent, but only that the master and auctioneer sold with his implied sanction, he being present and acquiescing in the act. Upon this question, the case of Idle v. Royal Exchange Assur. Co., 8 Taunt. 755, is in point. In that case, one of the owners of a ship was present at its sale by the master, and assented to the sale. Dallas, C. J., says, it was no less a sale by the master because one of the owners was present on the spot and concurred in it. Moreover, the power of attorney, in the present case, gave authority to sell "in case a fair price could be obtained," evidently with a view solely to the exercise of the power in a market or under circumstances where the price might be the subject of negotiation and election. The supercargo was manifestly a special agent, with a limited trust, and could dispose of the property only while acting strictly within the limits of the authority conferred. His presence, therefore, at the sale by the master, or even his assent or advice to that sale, does not constitute it a sale by him under his power of attorney from the owners. The claimants contend, however, that as the proceeds of the sale were paid to the supercargo, the court will intend that he paid them over to the libellants, and that the receipt of the money by the libellants implies a ratification of the sale on their part. A ratification by a principal of an act of an agent, after that act is performed, is, in its legal effect, the same as a precedent authorization to the agent; and the ratification may be either in the form of an express assent, or be implied by law from the absence of any dissent. The rule is, that where the act is done by one party, in the name of and affecting another, without his direct authority, there, if the latter does not, within a reasonable time after notice of the act, dissent therefrom, his assent and ratification will be presumed. 2 Kent, Comm. 616, and cases cited; Richmond Manuf'g Co. v. Starks [Case No. 11,802]. To constitute a ratification, however, it is obviously necessary that the act supposed to be ratified by the principal should itself be the act of the agent. It has been already seen, that a master who assumes to sell a ship, does so virtute officii, by authorization of law, and not as agent of the owner; or that, if, in this instance, the master assumed to act as agent of the owners, the circumstances, as they appear in evidence, did not confer upon him authority to sell, and that the sale was actually made by him without the participation of the supercargo. Admitting, therefore, that the libellants received the money from the supercargo, the claimants should, in order to establish a ratification of the sale, and bind the owners to its confirmation, have shown that the supercargo had directed the sale, or had at least received the purchase money as the vendor of the ship, knowing all the circumstances of her sale, and intending to confirm that disposition of her, in so far as he was capable of doing it, and that the libellants also knew of the facts, and received the money with similar intentions, expressed or implied. Those facts being established, ground would be laid for the inquiry, whether a disposal of property by an agent, without following the directions of his principal, and the receipt of the consideration money by the principal, without objection, do not conclude the principal from denying the validity of the act of the agent. Paley, Prin. & Ag. 145, 249. As the evidence stands, however, there seems to have been no affirmative act on the part of the agent, promoting or confirming the sale. He is to be regarded as having been a mere involuntary depositary of the money for the benefit of the lawful owner, rather than as having acquired it in the character of vendor of the vessel. The sale, therefore, which the principals are supposed to have ratified, cannot be deemed the act of the agent.

A further and controlling objection to applying the principle of subsequent ratification to this case is, that no proof is given that the libellants ever actually received the consideration money. This must be brought directly home to them, and no inference, controlling their interests, can be deduced from the circumstance of the payment to St. John of the price of the sale. It may yet remain in the hands of St. John, or, if passed over to the libellants, it may have been received by them under circumstances which leave their rights unimpaired by its receipt. The court will not intend, from the fact that it went into St. John's hands, that the libellants received it without reservation or qualification, or, indeed, that they received it at all. The prior title of the libellants must, therefore, prevail in this action, and they are entitled, upon the strength of it, to a restoration of the vessel or to her proceeds. The point then arises, whether they can recover her in the condition in which she was found when arrested in this action, or whether she is equitably chargeable with disbursements made in raising and repairing her abroad, and, with

the expenses she has incurred in the hands of the claimants since her arrival in this port.

The title of the claimants in the present case is invalid, upon legal objections. There is, in my judgment, no evidence establishing any fraudulent or improper participation, on the part of the purchaser, in procuring the sale or in buying at it. It is true, that he who takes an illegal title takes it at his peril; but, it has been held in the English court of admiralty, that where such title is not notoriously bad, the purchaser need not, in favor of the legal owner, be deprived of all remuneration for actual betterments put upon the property purchased. The Perseverance, 2 C. Rob. Adm. 239. The decree of restitution, in this case, proceeds upon the ground that the right of the original owner has not been divested, and not on the imputation of any improper act of the purchaser. However fair his conduct may have been, and notwithstanding he may have bought in entire ignorance of any defect in the proceedings or want of authority for the sale, the legal title remains in the libellants, and, upon that, restoration is awarded. There is, however, a manifest equity in requiring the owners to reimburse the expenses which were necessary to enable them to recover or enjoy their property. The purchaser was under no obligation to reclaim their vessel. He might have abandoned it, without incurring any responsibility to them; and, in that case, their property would have been an utter loss. Their master and supercargo assumed no further interest in the matter, but relinquished the vessel to the purchaser, as upon a valid sale. The libellants are, therefore, bound to remunerate those who rescued the wreck, for all indispensable expenditures bestowed upon the vessel in getting her off, and in so repairing her as to make her seaworthy. The English admiralty has relieved the purchaser in regard to betterments put by him on the vessel, under circumstances of less urgent equity. The Perseverance, 2 C. Rob. Adm. 239; The Kierlighett, 3 C. Rob. Adm. 96; The Nostra de Conceicas, 5 C. Rob. Adm. 294. The relief should be confined, however, to repairs to the hull of the vessel, and to the purchase of such tackle and apparel as did not before belong to her and were indispensable to her safe navigation. All the old equipments remained the property of the libellants, and, although the purchaser of the vessel may have purchased them of others who had bought them at the sale, his right so acquired must yield to the elder and paramount title of the owners.

The next consideration is the one respecting the repairs made in this port. These cannot be considered as indispensable to the preservation of the vessel, and were, it would seem, of a much more expensive character than was necessary for her safe and profitable employment. If they were put on by the claimants after notice of the libellants' claim of property, and without their assent, they would, in strictness of law, be at the hazard of the claimants. The testimony is singularly deficient on this point. If the libellants, knowing of the arrival of the vessel at this port, and of her refitment, kept back their claim until the expenditures were completed, they committed a fraud on the claimants. and this court would compel the satisfaction of all disbursements chargeable to the claimants for such repairs. In the absence of evidence on either side, the inference on this point must be, that the vessel lay in port without the knowledge of the libellants, and that the claimants made the repairs in good faith, and under the persuasion that they were the legal owners. As any allowance in the case is made upon considerations of equity, the court is bound not to suffer the equities of the innocent purchaser to merge and annihilate the equities of the real owner. The possessor of the vessel, by whatever good faith he was actuated, ought not to be allowed to burden the owner with bills for repairs which were in no way necessary to enable him to acquire the possession and use of his vessel, and to an amount which would absorb and extinguish his actual interest in her. The claimants allege that the vessel was worth, on her arrival here, but $700, and that they expended $2,260 65 in her refitment, and they also offer proof that she sold, after being so repaired, for $2,500. To charge all these disbursements upon the vessel, would extinguish nearly the entire interest of the real owners. On the other hand, if the repairs augmented the available value of the vessel, the owners ought not to reap that advantage at the expense of the innocent purchasers.

The rule which the court adopts is, to allow the libellants the full value of the vessel on her arrival in this port, deducting, as before stated, the amount of expenditure reasonably necessary to raise her, repair her bottom and fit her for sea, and deducting also the amount of disbursements, at their fair value at the port of refitment, for the tackle and apparel she had on board when she was seized by the libellants, which did not belong to her when she stranded; and to allow to the claimants all that it may be proved their repairs increased her value between what she was worth when she arrived and her fair value at the time she was restored to them on their bond, subject to such determination as to costs as may be made on the final disposal of the whole case. As the vessel was bonded by the claimants after her arrest in this cause, and was delivered up to them on an agreed valuation of $3,500, the amount to be recovered by the libellants cannot exceed that sum, whatever may have been the value of the vessel on her arrival. The prayer of the libel also asks, that the earnings of the vessel on her return voyage may be decreed to the libellants. It is not stated in any of the pleadings, nor is it shown by the proofs, what freight was

earned, and the court would not be able to make any specific decree on that subject. Nor has the point been discussed by the counsel on either side. The general right to freight, as a consequence from the decree adjudging the ownership to be in the libellants, would probably not be controverted; and the case, as it has been presented to me, does not require me to decide whether freight can be recovered in this form of action, as an incident to the main subject matter of the decree. I shall, therefore, make no order in reference to the freight, though I would, on the application of the libellants, have referred it to the clerk to ascertain the amount of the freight, leaving the general question of the remedy open to be discussed on the coming in of the report.[3]

Afterwards, on the application of the libellants to have the decree of reference enlarged, so as to embrace the freight earned by the brig on her homeward passage, an order was made referring it to the clerk to ascertain, also, the amount of freight earned or justly chargeable upon the homeward voyage, and the amount of charges and expenditures incurred in the navigation, lading and unlading of the vessel. Upon the coming in of the clerk's report, exceptions were taken because the cargo upon which freight was estimated was less than that specified in the bill of lading. The amount of the items as reported by the clerk, and the evidence upon which they rested, (being a copy of the claimants' account with the master, upon the settlement of the voyage from Matamoros to New-York,) were also objected to.

BETTS, District Judge. A bill of lading is never considered conclusive as to the quantity of the cargo shipped, and is, at most, but prima facie evidence to charge the

[3] The main provisions of the decree were as follows: "That it be referred to the clerk to compute and ascertain, upon the proofs in court, and such further evidence as either party may produce before him, the amount of such expenditures made at the port of Matamoros, in raising, repairing and refitting the said vessel after her abandonment by her former master, Titterton, and the fair reasonable value of the labor, repairs and refitments bestowed upon the vessel, at the time the same were made and supplied, and that the clerk distinguish in his report, in so far as may be practicable on the proofs, the new materials and equipments, if any were furnished, from those belonging to the vessel, at the time she stranded, and the value thereof respectively; and that the clerk also compute and ascertain, upon competent proofs, the fair value of the said brig Henry, on her arrival at this port, and before repairs were put upon her by the claimants in October last past, and also the fair value of the said vessel after the repairs and refitments put upon her by the claimants, and at the time of her attachment in this suit, and also the value of any of the tackle, apparel and furniture or materials of the vessel, disposed of or retained by the claimants in making the repairs aforesaid, if any such were disposed of or retained, and that the clerk report upon the premises with all convenient speed."

master or owner. 2 Phil. Ins. 490. The consignee or owner here would be bound to pay freight only for the goods delivered; and, as the accounting ordered demands no more than the freight earned, the amount chargeable on delivery of the goods is all for which the claimants are bound to account. The original account upon which the settlement of the voyage was made with the master has not been produced; and there is a technical objection to the evidence by which the charges are supported. But, inasmuch as the objection, if allowed to prevail, would go to exclude all the proofs offered by both parties, and, as the merits of the case are fully brought out, I prefer, rather than expose the parties to the expense of a new reference merely to verify a ·document necessary to both, to proceed to consider the case as if the copy were properly received in place of the original account. As to the $80 received by St. John at Matamoros, for the price of the vessel on her sale, it is not directly proved that it was paid over by him to the libellants. If he retains the money, he has it as a stakeholder for the libellants. But, as he was examined by the libellants in court in relation to the proceedings at Matamoros, and this charge stood on the account against them, and there was proof of the payment of the money to him as their agent or supercargo, I think it belonged to them, and not to the claimants, to examine him upon the subject. The presumption is strong, that in accounting to them for the voyage, he also accounted with them for that money, as all he had to show for the vessel. I shall, therefore, allow that amount.

Various items in the clerk's report were re-adjusted, and the final decree, as entered, allowed to the libellants—

| | |
|---|---:|
| For the value of the vessel at the time of her arrival in New-York | $2,000 00 |
| And for the freight earned | 429 76 |
| | $2,429 76 |

| | | |
|---|---:|---:|
| Allowing first to the claimants the charges of the navigation of the vessel to New-York... | $227 00 | |
| Expenses of repairs, &c., at Matamoros | 733 50 | |
| Purchase money paid at Matamoros | 80 00 | 1,040 50 |
| | | $1,389 26 |

It was thereupon decreed, that the libellants recover $1,389 26 and costs, and that the residue of the proceeds, if any, be paid to the claimants, in part payment of $1,500 allowed to them as the fair and reasonable value of the repairs and betterments put upon the vessel before her arrest by the libellants.

NOTE. This case was taken to the circuit court by appeal, and additional proofs were given in that court. The decree of this court was reversed, upon the ground that the claimants proved, by new evidence, a regular survey of the vessel before her sale, and her desperate condition when the master ordered her sale. [Case unreported.]